RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0200p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

OGHENEVWAKPO IGBOBA,

*Defendant-Appellant.*

No. 19-1116

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cr-00044-1—Robert J. Jonker, District Judge.

Decided and Filed: July 2, 2020

Before: COLE, Chief Judge; CLAY and NALBANDIAN, Circuit Judges.

---

## COUNSEL

**ON BRIEF:** Gary W. Crim, Dayton, Ohio, for Appellant. Christopher M. O'Connor, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

---

## OPINION

---

CLAY, CIRCUIT JUDGE. A jury convicted Defendant Oghenevwakpo Igboba on multiple criminal counts based on his participation in a conspiracy to defraud the United States Department of the Treasury by preparing and filing false federal income tax returns using others' identities. Defendant was subsequently sentenced to 162 months' imprisonment, followed by three years of supervised release, and required to pay restitution, special assessment, and forfeiture sums.

Defendant challenges that sentence on appeal, presenting two primary arguments.  First, he argues that when the district court increased his base offense level based on the total amount of loss his offense caused, pursuant to U.S.S.G. § 2B1.1(b)(1), it failed to distinguish between the loss caused by his individual conduct and that caused by the entire conspiracy.  Second, Defendant asserts that the district court erred in applying a two-level sophisticated-means enhancement, *id.*, § 2B1.1(b)(10), because the means he used did not qualify as sophisticated.

For the reasons set forth below, we **AFFIRM** the district court's decision.

## BACKGROUND

On February 7, 2017, a grand jury charged Defendant Oghenevwakpo Igboba with twenty-two criminal counts arising out of his participation in a fourteen-month-long conspiracy to defraud the United States Department of the Treasury Internal Revenue Service ("IRS") by preparing and filing false and fraudulent tax returns.  As part of this conspiracy, Defendant allegedly acquired his victims' personally identifying information ("PII") through various email accounts and then used that PII to file fraudulent tax returns, directing the proceeds into his own bank account or the bank accounts of his associates.  After a four-day trial, a jury found Defendant guilty of the following eighteen counts: one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 286; one count of wire fraud, in violation of 18 U.S.C. § 1343; eight counts of making false, fictitious, or fraudulent claims to a United States agency, in violation of 18 U.S.C. § 287; and eight counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), (b), and (c)(5).

Prior to Defendant's sentencing hearing, the United States Probation Office prepared a presentence report ("PSR").  As relevant on appeal, the PSR recommended increasing Defendant's base offense level by eighteen levels pursuant to U.S.S.G. § 2B1.1(b)(1)(J) because his offense resulted in intended loss in the range of $3.5 million to $9.5 million—specifically, $4,257,674.06.  The PSR further applied a two-level sentence enhancement pursuant to § 2B1.1(b)(2)(A)(i) because the offense involved ten or more victims.  Finally, it recommended an additional two-level enhancement pursuant to § 2B1.1(b)(10), which applies where the defendant relocated the scheme to another jurisdiction to avoid detection by law enforcement, a

substantial portion of the scheme was committed outside of the United States, or the offense otherwise involved sophisticated means.

Defendant objected to the PSR's calculation of the approximately $4.2 million loss attributable to his offense. Specifically, he argued that "[t]here is insufficient proof that [he] actually, subjectively intended to inflict more than $4.2 million in losses" and that "there is insufficient evidence . . . [to show] that *Mr. Igboba's* fraud (as opposed to someone else's fraud) caused the loss," in particular because the evidence did not suggest that he had "actual, singular control—much less *exclusive* control—over the[] various email accounts that were linked to the refund requests." (Def. Sent'g Memo., R. 106 at PageID ##522, 524.) Defendant also disputed the applicability of the sophisticated-means enhancement, arguing that none of the relevant qualifying circumstances was present in this case.

At sentencing, the district court summarized the PSR's Guidelines calculations and Defendant's objections before inviting the parties' evidence. The government then presented the testimony of Special Agent Nathan LaFramboise with the Treasury Inspector General for Tax Administration. In the course of his testimony, LaFramboise discussed eight exhibits that allegedly showed Defendant's connection to the losses attributed to him and revealed his sophisticated means.

First, LaFramboise discussed a government-compiled spreadsheet that listed attempted and actual tax refunds lost by the Treasury Department due to Defendant's criminal conduct and identified the evidence used to connect Defendant to those refunds. Second, LaFramboise testified about a document entitled "How to file tax refunds" that was found on a thumb drive in Defendant's apartment. (Sent'g Hr'g Tr., R. 155 at PageID ##1380–81.) This document directed readers to use a virtual private network ("VPN") and a "[c]lean email . . . created while VPN is active" when they file returns. (*Id.*) Next, LaFramboise discussed several emails sent or received by lee.su60@yahoo.com, one of Defendant's email addresses. These included an email from that account that instructed another individual on how to buy taxpayers' PII online by accessing the dark web using the internet browser Tor. Another email, sent from the Lee Su email address to Defendant's codefendant, indicated the use of a Somalian website to generate social security numbers. A third was sent to the Lee Su address by

oghenevwakpoigboba@yahoo.com, and included a list of sites on the dark web accessible only through the Tor browser. A fourth had the subject line "Workdone9" and listed taxpayers' PII and sums of money. (*Id.* at ##1374–75.) LaFramboise confirmed that this email was one of several similar messages sent by Igboba's codefendant to the Lee Su email address. The last email was sent from Lee Su to Igboba's codefendant and listed cryptocurrency sums and other email addresses. Finally, LaFramboise identified one of Defendant's bank statements showing that Defendant's debit card was used to purchase VPN service.

In testimony supporting the loss calculation, LaFramboise explained that he was "conservative" in estimating the loss attributable to Defendant. (*Id.* at #1376.) He stated that when putting together the aforementioned spreadsheet documenting the attributed losses, he only included losses that were linked to Defendant by two or more of the following: (1) tax refunds directed to Defendant's personal or business accounts or those of his family members or known associates; (2) Defendant's possession of the taxpayer's PII at the time of the tax filing; (3) use of emails associated with Defendant or the conspiracy in filing the returns or accessing tax transcripts; and (4) the filing's inclusion on lists of returns submitted that Igboba's codefendant emailed to him.

LaFramboise also said that he believed "there were more returns filed by members of the conspiracy than [we]re listed on [the] spreadsheet." (*Id.*) He explained, as a specific example, that Defendant was not held responsible for returns associated with an email—kimfay@outlook.com—whose owner sent tax transcripts to Igboba's codefendant. Although there was sufficient evidence to link the owner of that email address to the broader conspiracy, this evidence was excluded because there was insufficient evidence to link her to Defendant. LaFramboise further noted that he did not include tax returns that were rejected by the IRS because they were already filed. He also removed at least two loss amounts from the spreadsheet after giving that information to the PSR writer but before presenting it at sentencing—because he found out that the IRS had not issued a refund on one return and that Defendant had not necessarily accessed another transcript.

The government also solicited testimony from LaFramboise on the means that Defendant used to commit his offense.  As previously mentioned, LaFramboise discussed evidence suggesting Defendant used a VPN, specially created clean emails, the dark web, and international sources to commit his crime.  He also explained that tax refunds were channeled to multiple bank accounts, whose owners would then write checks to Defendant.  LaFramboise further attested that Defendant funneled refunds through bank accounts associated with shell companies, including two limited liability companies called Fingerprint Store and Bubbly Fashion, neither of which had any legitimate business purpose or physical or online presence at the relevant time.  He also noted that Defendant used cryptocurrency to make payments in the course of the conspiracy.  Finally, he testified that a substantial portion of the scheme was committed outside the United States, in particular because multiple members of the conspiracy lived outside the country.

Defendant did not put on any evidence of his own, but simply sought to undermine LaFramboise's testimony on cross-examination.  Defendant's counsel drew into question whether Defendant had used cryptocurrency in the course of his fraud.  He similarly questioned whether Defendant's email aliases could have been used by others.  LaFramboise agreed that they could have, but he noted that there was "no evidence that anyone else was accessing" those aliases.  (*Id.* at #1387.)  LaFramboise also confirmed that he could not be sure that "Mr. Igboba was actively involved in every one of [the attempted tax fraud] transactions."  (*Id.* at #1389.)  Finally, he agreed that most of the conspiracy occurred in the United States.

When the court invited the parties' arguments, Defendant reiterated his objections to the amount of loss calculated and the sophisticated-means enhancement.  With respect to the amount of loss, he focused on his subjective-intent argument, but also noted that "multiple people . . . can have access to the same email address provided they have the password" and "based on the ambiguity and . . . uncertainty here . . . the government's projection of the intended loss is exaggerated."  (*Id.* at #1398.)

After hearing the parties' arguments, the district court overruled Defendant's objection to the amount of loss calculated and found that his base offense level should be increased by eighteen levels under U.S.S.G. § 2B1.1(b)(1)(J).  It concluded, in relevant part, that

LaFramboise's testimony was more than sufficient to show that $4.1 million in loss was attributable to Defendant by a preponderance of the evidence.[1]  Specifically, it reasoned that the government had shown that each portion of the loss was connected to Defendant in at least two ways that it found "sufficiently reliable," and noted that the government had also removed and added individual items from its loss calculation based on this methodology.  The court emphasized that, while it could not be certain that the email aliases in question were only used by Defendant, the jury was apparently convinced beyond a reasonable doubt that Defendant was behind those aliases.  And it reasoned that, while other people may have been involved in some of the losses,

> I don't think that detracts from what we're talking about here when we're talking about coordinated conduct, conspiratorial conduct where each conspirator can and usually is accountable for what was reasonably within the scope of the conspiracy as they understood it.  And certainly at a minimum this was within the reasonable scope of the conspiracy as Mr. Igboba understood it . . . [because] you have at least two things that tie each of these particular returns back to Mr. Igboba.

(*Id.* at #1408.)

The court next considered Defendant's objection to the sophisticated-means enhancement.  It concluded that this enhancement applied whether or not cryptocurrency was used in the offense and whether or not most of it happened in the United States.  The court explained that "the sophisticated nature of the scheme is what required us to march through such a vast amount of paperwork in order for the government to link . . . the particular transactions to the wrongdoing here and link it to Mr. Igboba."  (*Id.* at #1409.)  As signs of the offense's sophistication, the court highlighted Defendant's use of a VPN, Tor, the dark web, multiple bank accounts, and multiple email aliases to commit the crime, as well as the difficulty of acquiring taxpayer PII in the first place.

After detailing these analyses, the court asked if the parties saw "any other guideline issues."  (*Id.* at #1412.)  Defendant said no.  The court next detailed its Guidelines range calculation and analysis of the 18 U.S.C. § 3553 factors.  It then asked for the parties' legal

---

[1]The amount was adjusted from approximately $4.2 million to approximately $4.1 million because the government eliminated items from its loss calculation after making that calculation available for the preparation of the PSR.

objections to its analysis, pursuant to *United States v. Bostic*, 371 F.3d 865 (6th Cir. 2004). Defendant again made no objections.  Finally, the court handed down its sentence of 162 months' imprisonment followed by three years of supervised release, as well as restitution, special assessment, and forfeiture sums.

This timely appeal followed.

## DISCUSSION

### I. Amount of Loss

On appeal, Defendant argues that the district court failed to adequately distinguish between losses attributable to him and losses attributable to the entire conspiracy when it increased his base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(J).  Defendant specifically asserts that the court erred by failing to assess whether the losses attributed to him were the products of "jointly undertaken criminal activity." (Def Br. at 13.)  We disagree.  The losses attributed to Defendant did not reflect those caused by the entire conspiracy, and the district court could rightly hold him accountable for these losses as the products of his own individual activity.

Before delving into this issue, we must first consider whether it has been properly preserved for our review.  At sentencing, Defendant objected to the amount of loss attributed to him for two reasons.  First, he argued that there was "insufficient proof that [he] actually and subjectively intended to inflict more than $4.2 million in losses." (Sent'g Hr'g Tr., R. 155 at PageID #1397.)  Second, he argued that the government had not presented sufficient proof that he had caused that intended loss, in particular because multiple people could have accessed the email addresses that connected him to some of the loss amounts listed in the PSR.  On appeal, the government argues that Defendant's objections were insufficient to preserve his current argument.  Defendant does not meaningfully dispute this point.

We agree that Defendant has not properly preserved the argument presented on appeal. At sentencing, he did not argue that the relevant losses were not attributable to his jointly undertaken criminal activity, and so did not alert the district court to its alleged wrongdoing.  *See*

*United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009) (holding that an issue is preserved if a litigant "state[s] the issue with sufficient clarity to give the court and opposing parties notice that it is asserting the issue" and "provide[s] some minimal level of argumentation in support of it"). In fact, Defendant twice rejected the district court's request for objections to its analysis. By failing to object to that analysis specifically, Defendant deprived the court of its due "opportunity to address the error in the first instance," and failed to ensure that the issue was sufficiently discussed to allow this Court "to engage in more meaningful review." *Bostic*, 371 F.3d at 871.

This bears on the applicable standard of review. Where a procedural reasonableness claim—like this one—has not been properly preserved, we apply plain error review, considering whether there is "(1) error (2) that was 'obvious or clear,' (3) that 'affected [the] defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018) (alteration in original) (quoting *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc)). This standard is "extremely deferential to the district court, and it should be found 'sparingly, only in exceptional circumstances, and solely to avoid a miscarriage of justice.'" *Id.* (quoting *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 483 (6th Cir. 1999)).

We turn now to the merits of Defendant's argument. When calculating the applicable Guidelines range for a defendant convicted of fraud, the defendant's base offense level is increased in proportion to the amount of actual or intended pecuniary loss that resulted from his offense. *Donadeo*, 910 F.3d at 894; U.S.S.G. § 2B1.1(b)(1) & cmt. n.3(A). Given the difficulty of calculating loss in a fraud case, "the district court need only make a reasonable estimate of the loss using a preponderance of the evidence standard." *United States v. Ellis*, 938 F.3d 757, 760 (6th Cir. 2019) (quoting *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013)). A sentencing court may consider any "relevant conduct" in determining the amount of loss attributable to a defendant under § 2B1.1(b)(1). *Donadeo*, 910 F.3d at 894. This includes:

> (A) all [criminal] acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others,

whether or not charged as a conspiracy), all acts and omissions of others that were—

> (i) within the scope of the jointly undertaken criminal activity,
>
> (ii) in furtherance of that criminal activity, and
>
> (iii) reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1). "Accordingly, the amount of loss attributable to a defendant may include any loss that resulted from his/her own criminal conduct, as well as any loss that resulted from certain conduct of others." *Donadeo*, 910 F.3d at 894.

In the case at bar, the district court did not specifically address whether the relevant $4.1 million in losses was attributable to Defendant under subsection (A) or subsection (B). But its analysis suggests that it found all $4.1 million attributable to Defendant's own criminal activity, rather than others' acts that were a part of "jointly undertaken criminal activity." The court reasoned that the evidence cited on the government's loss-calculation spreadsheet was "more than enough to link this [loss to Defendant] by a preponderance." (Sent'g Hr'g Tr., R. 155 at PageID #1407.) It also found that the government's "methods of tying the particular taxpayer returns to Mr. Igboba . . . are sufficiently reliable to achieve the preponderance-of-the-evidence standard," and explicitly noted that where Defendant could not be directly connected to a loss through reliable evidence, that loss was not included in the sum attributed to him. (*Id.* at #1408.)

On appeal, Defendant does not identify any specific portion of this $4.1 million sum that is not attributable to his own activity—instead, he seems to suggest that the entire sum was only attributable to others' activity. Upon review, we conclude that the district court could rightly attribute the relevant $4.1 million in losses to Defendant's individual criminal activity based on a preponderance of the evidence. Although Defendant repeatedly asserts that the $4.1 million for which he was held responsible represented the losses caused by the entire conspiracy, LaFramboise explained at sentencing that there were many fraudulent returns filed by members of the conspiracy that were not included in the amount of loss attributed to Defendant. And the

government's loss-calculation spreadsheet connects each loss to Defendant individually—rather than to the conspiracy more broadly—through specific, identified pieces of evidence. These connections suggest that Defendant himself participated in filing the relevant fraudulent returns—whether by acquiring the taxpayer's PII, instructing others on how to file the return, directing others to file the return, or otherwise.

While Defendant argues that some of the evidence connecting him to this activity was unreliable, he has not actually shown that this is the case. For example, Defendant asserts that others could have accessed the email accounts that connected him to the fraudulent returns, but points to no evidence that they actually did. The weight of the evidence before the district court thus suggested that these connections were reliable.

In his reply brief, Defendant points out that there were not, in fact, two pieces of evidence linking him to every one of the losses attributed to him. He specifically notes that thirty-five of the 210 individual amounts attributed to him are based upon only a single evidentiary connection. Defendant is correct in this regard, and we agree that the district court erred in finding that "at least two things . . . tie each of these particular returns back to Mr. Igboba." (*Id.*) But no law, rule, or Sentencing Guideline requires that a defendant be connected to a loss through at least two pieces of evidence. The government simply tried to show at least two connections as part of an appropriate effort to be "conservative" in estimating the loss attributable to Defendant. (*Id.* at #1376.)

Our precedent establishes that "the district court need only make a reasonable estimate of the loss [attributable to a defendant] using a preponderance of the evidence standard." *Ellis*, 938 F.3d at 760 (quoting *Wendlandt*, 714 F.3d at 393). In light of that standard, we can discern no error in the district court attributing even these single-link sums to Defendant. Our review of the loss-calculation spreadsheet relied upon by the district court reveals that where amounts were attributed to Defendant based on only one evidentiary link, that link was particularly strong—for example, the refund went directly to Defendant's personal bank account, the return and transcript were found in Defendant's possession, or the return was included in one of the "work done" emails passed between Igboba and his codefendant. (*See, e.g.*, Gov't Ex. 300, Doc. No. 60 at 3 (line 17 showing the sum was directed to Defendant's personal account); *id.* at 6 (line 60

showing the return and transcript were found on a thumb drive in Defendant's apartment); *id.* at 8 (lines 88 and 99 showing these returns were listed in "work done" emails).) And Defendant presented no evidence suggesting these losses were not attributable to him to weigh against the government's evidence. Finally, it is worth noting that the sum of the losses attributed to Defendant based on only a single link is $561,875. Even if we were to conclude that these losses were wrongly attributed to Defendant, the total loss caused by his activity would still surpass the $3.5 million threshold at which U.S.S.G. § 2B1.1(b)(1)(J) becomes applicable.

Thus, the district court could rightly attribute $4.1 million in losses to "acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by" Defendant. U.S.S.G. § 1B1.3(a)(1)(A). Defendant tries to confuse the issue by asserting that these losses were instead caused solely by others' criminal activity, and so the district court was obligated to assess whether they could properly be considered the product of "jointly undertaken criminal activity" under § 1B1.3(a)(1)(B). And both parties devote a substantial portion of their appellate briefing to analyzing the "factors relevant to determining the scope of the criminal activity that a defendant agreed to jointly undertake" laid out in *United States v. Donadeo*. 910 F.3d at 895. But that analysis is unnecessary here because § 1B1.3(a)(1)(B) "does not apply to conduct that the defendant personally undertakes." *See United States v. Burns*, 101 F. App'x 82, 84 (6th Cir. 2004); *see also United States v. Howard*, 36 F. App'x 758, 761 (6th Cir. 2002) (per curiam); *United States v. Wilson*, 168 F.3d 916, 922 n.4 (6th Cir. 1999). As we have discussed, the evidence before the district court suggested that Defendant personally participated in the activity that caused each of the losses attributed to him. "[E]ven if other people [also] participated" in this activity, "that would not negate the substantial evidence implicating [Defendant] [him]self." *Ellis*, 938 F.3d at 762. Accordingly, we need not—and do not—reach the question whether those losses could also be attributed to Defendant as the product of "jointly undertaken criminal activity." U.S.S.G. § 1B1.3 cmt. n.2 ("If a defendant's accountability for particular conduct is established under one provision of [U.S.S.G. § 1B1.3], it is not necessary to review alternative provisions under which such accountability might be established.").

The district court thus made no error in attributing $4.1 million in losses to Defendant at sentencing. Because there was no error, we also need not consider whether such error was obvious or clear, affected Defendant's substantial rights, or affected the fairness, integrity, or public reputation of the proceedings. *See Donadeo*, 910 F.3d at 893. We affirm the district court's decision to hold Defendant responsible for $4.1 million in losses.

## II. Sophisticated-Means Enhancement

Defendant next argues that the district court erred in finding that his offense involved sophisticated means and therefore merited the application of a two-level enhancement under U.S.S.G. § 2B1.1(b)(10). Defendant has properly preserved this argument. Thus, we review the district court's determination that his offense involved sophisticated means for clear error. *United States v. Kraig*, 99 F.3d 1361, 1371 (6th Cir. 1996); *United States v. Pierce*, 643 F. App'x 500, 502 (6th Cir. 2016). Our review demonstrates that the district court did not err in applying this enhancement.

Sentencing Guideline § 2B1.1(b)(10) provides for a two-level enhancement of a defendant's base offense level if

> (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

The district court found that Defendant's offense involved "sophisticated means" under subsection (C). "[S]ophisticated means" require "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, cmt. n.9(B). As an example, the Commentary notes that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts . . . ordinarily indicates sophisticated means." *Id.*

Defendant first contends that the district court erred because it determined that his offense involved sophisticated means only because of the quantity of paperwork involved. This

misrepresents the district court's analysis. The court suggested that the sophisticated means used were the reason why so much documentary evidence was necessary to prove Defendant's crime—not that the paperwork involved was itself what made the offense sophisticated. (*See* Sent'g Hr'g Tr., R. 155 at PageID #1409.) Instead, the court referred to Defendant's use of a VPN, the Tor browser, the dark web, multiple bank accounts, and multiple email aliases in committing his offense. It also noted the difficulty of acquiring the taxpayer PII used to file the fraudulent returns.

Defendant more generally asserts that these means were not sophisticated because they "relied on software and internet procedures available to the general public." (Def. Br. at 18.) Our precedent suggests otherwise. In *United States v. Ealy*, 682 F. App'x 432, 438 (6th Cir. 2017), we found that the sophisticated-means enhancement applied where a defendant "purchased [PII] from an overseas broker through an 'anonymous' electronic 'black market financial network' and concealed his actions through complex methods such as VPN software." The case at bar nearly mirrors *Ealy*'s facts. Evidence before the district court showed that Defendant acquired PII from a Somalian website and used a VPN and the ultra-private Tor browser to conceal his actions. This suggests that Defendant's means were at least as sophisticated as those in *Ealy*.

Moreover, Defendant's offense involved sophisticated means beyond the use of this technology. The record also showed that Defendant used corporate shell companies—specifically, the Fingerprint Store and Bubbly Fashion—to receive tax refunds. Although the district court did not explicitly cite this conduct to support the application of the enhancement, this is a paradigmatic example of using sophisticated means. *See* U.S.S.G. § 2B1.1, cmt. n.9(B). Defendant argued before the district court that he did conduct legitimate business through these companies at one time and argues on appeal that "there is no evidence" that he "set[] up corporations to hide the money." (Def. Br. at 19.) But true or not, these arguments "miss[] the point. The fact remains that the court had clear evidence that [Defendant] used corporate entities in furtherance of his criminal activities." *United States v. Benchick*, 725 F. App'x 361, 369 (6th Cir. 2018).

Defendant also used multiple different email aliases to perpetrate his crime. We have found that a defendant's use of an alias to cover up evidence of a crime can indicate sophisticated means. *See United States v. Crosgrove*, 637 F.3d 646, 667 (6th Cir. 2011) (noting that "the repeated use of fictitious identities can justify a sophisticated means enhancement, particularly when the identity is reinforced through other deceptive practices, such as instructing [others] in handling calls directed to the fictitious party"); *see also id.* (collecting cases). And although Defendant's creation of new email addresses alone may not be sufficient to show sophisticated means, as it does not match the complexity of the false identity construction we have concluded independently justified the enhancement, Defendant's use of multiple email aliases certainly points towards a finding of sophisticated means.

Defendant's remaining argument against the enhancement's applicability is unavailing. Defendant notes several times that these email aliases "were easily traceable to his address" and that the tax refunds were placed directly into accounts associated with him. (Def. Br. at 20–21.) But the fact that Defendant failed to successfully hide his identity does not indicate that his means were not sophisticated. If it did, courts would never be able to apply the sophisticated-means enhancement to a known defendant—surely an illogical result. We have applied the enhancement to defendants who "routed money through [their] own bank account" and "failed to disguise [their] identity" before. *Pierce*, 643 F. App'x at 503. The district court did not clearly err in doing so here.

The district court found that the sophisticated-means enhancement "easily applies by a preponderance" of the evidence. (Sent'g Hr'g Tr., R. 155 at PageID #1409.) Taken in sum, the evidence presented at sentencing justifies that conclusion. Thus, we also affirm the district court's decision as to this issue.

## III. *Pro Se* Issues

In an exercise of our "broad discretion to determine who practices before [this Court]," upon denying Defendant's motion to proceed *pro se* on appeal, we permitted him to file a *pro se* supplemental brief. *Miller v. United States*, 561 F. App'x 485, 489 (6th Cir. 2014) (quoting *United States v. Dinitz*, 538 F.2d 1214, 1219 (5th Cir. 1976)); *see also United States v. Darwich*,

574 F. App'x 582, 588 n.6 (6th Cir. 2014).  We also invited the government's response to that brief.

Defendant makes two additional arguments in his *pro se* brief.  First, Defendant argues that the district court erred by relying upon facts not found by a jury or admitted by him at sentencing.  Second, he contends that the district court wrongly included individuals whose losses were reimbursed when it counted the victims of his crime for the purposes of applying an enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(i).  Defendant did not present these issues to the district court, and so we review both for plain error.

Neither argument has merit.  Regarding the first, following *United States v. Booker*, 543 U.S. 220 (2005), "a district court may enhance a defendant's sentence 'based upon facts not found by a jury, provided they do not consider themselves required to do so.'"  *United States v. Kosinski*, 480 F.3d 769, 776 (6th Cir. 2007) (quoting *United States v. Davis*, 397 F.3d 340, 352 (6th Cir. 2005) (Cook, J., concurring)).  Defendant does not argue that the district court considered the Guidelines mandatory, and the record does not suggest it did.

Turning to the second issue, Defendant does not indicate which or how many victims were wrongly considered in applying the number-of-victims enhancement, and so this argument is factually meritless.  It is also legally meritless, as under the current version of the Guidelines, a "victim" of a fraud scheme includes "any individual whose means of identification was used unlawfully or without authority."[2]  U.S.S.G. § 2B1.1, cmt. n.4(E).  The Sentencing Commission has explained that even an individual who has been reimbursed "should be considered a 'victim' for purposes of subsection (b)(2) because . . . [she] must often spend significant time resolving credit problems and related issues, and such lost time may not be adequately accounted for in the loss calculations under the guidelines."  U.S.S.G. app. C, amend. 726 (2009) (Reason for Amendment).  Defendant has not shown that any victims were miscounted under this definition.

---

[2]A "means of identification" includes "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual," including—among other things—his or her name, social security number, birth date, and taxpayer identification number.  18 U.S.C. § 1028(d)(7); *see also* U.S.S.G. § 2B1.1, cmt. 1 ("'Means of identification' has the meaning given that term in 18 U.S.C. § 1028(d)(7) . . . .").

Accordingly, the district court did not make either of the errors Defendant suggests. Absent error, this Court need not reach the remaining elements of the plain-error analysis.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision in its entirety.