NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0259n.06

Case No. 20-6131

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
May 27, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Appellee,* | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| JAMES JACKSON, | ) | |
| | ) | |
| *Defendant-Appellant.* | ) | O P I N I O N |
| | ) | |

BEFORE: NORRIS, KETHLEDGE, and NALBANDIAN, Circuit Judges

NALBANDIAN, Circuit Judge. The best that he could, James Jackson turned the evidence of his crimes into a pile of ashes. But the evidence that remained was enough to convince a jury that Jackson ran an elaborate scheme of impersonating deceased victims and then stealing their identities and savings. On appeal, he argues that the evidence was insufficient for the convictions. He also challenges his sentence as unreasonable. We **AFFIRM** the verdicts and the sentence.

## BACKGROUND

In late 2014 and early 2015, investigators caught on to an identity theft and mail fraud scheme in Tennessee involving fraudulent charges on accounts of recently

deceased persons.[1] The eventual indictment focused on six victims: Robert and Kim Howe, Thomas Fitzgibbon, Peggye McNair, Charles Fulks, and Michael Almeida.

Kim Howe died in February 2015, predeceased by her husband Robert. After her death, someone claiming to be Robert called Fidelity Investments, had the Howe's account address changed to a vacant house on Cameron Ridge Trail in Cordova, Tennessee, and liquidated $350,000 in stocks. After Peggye McNair died in January 2015, someone accessed her Amex account and had cards sent to the same vacant Cameron Ridge address. They charged over $13,700 to her account. Eugenie Almeida reported fraudulent charges on her deceased husband's debit card to the police, who discovered that a recently issued card in Michael Almeida's name had been used for cash withdrawals at several Tennessee locations. Security footage showed a man later identified as Derrick Ford—a friend of James Jackson's—using the card.[2] Yvonne Fitzgibbon likewise reported the theft of her late husband Thomas' identity. Government agents intercepted mail addressed to Thomas headed to a vacant address on Waterdance Drive in a Memphis suburb, nowhere near where Thomas had lived. As the investigation continued, officers also flagged financial mail headed

---

[1] We state the facts in the light most favorable to the government, in keeping with the standard of review. *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011).

[2] Ford also visited a La Quinta Inn in Memphis with a fake ID and tried to retrieve mail from Capital One addressed to Robert Matthews. He arrived in a white Mercedes SUV driven by someone else who was not visible in the security footage. The desk clerk rebuffed his attempt to retrieve the mail after his card was flagged, and he left.

to the vacant Waterdance and Cameron Ridge addresses for several more identity theft victims in addition to Robert and Kim Howe and Peggye McNair.

Investigators zeroed in on the culprit when they put a hold on mail headed to the vacant houses, which included a Capital One card for Charles Fulks en route to Waterdance Drive. Less than a month after Fulks' death, someone claiming to be him called the post office to ask about the mail.[3] Officers planned to arrest him when he came to pick up the mail, but he later called back and asked the post office to deliver it to the vacant Cameron Ridge house. So they moved the operation to Cameron Ridge, delivered the mail, and waited. Around ten o'clock that night, a man in a bathrobe emerged from Jackson's house across the street, walked to the vacant Cameron Ridge house's mailbox, took the mail addressed to Fulks, and returned to Jackson's house.

Officers approached Jackson's home and knocked on the door, but Jackson didn't answer. They knocked louder and announced themselves as police, but there was no sign of Jackson. After almost an hour, two of the officers finally left to get a search warrant. While they were gone, the remaining officers saw smoke begin to billow from the house as an orange glow flickered inside. As smoke filled the house, Jackson's girlfriend—Michelle Jones—leaned out a second-floor window and told the officers that she and her three children were inside and were having trouble breathing. Jones wanted to leave the house through the front door, but Jackson told

---

[3] At trial, Jones identified caller as Jackson.

her not to. Officers dissuaded her from jumping out the window and persuaded her—contrary to Jackson's instructions—to open the front door and leave. The officers then entered, brought Jackson out of the home, and gave him oxygen.

Inside the smoke-filled house, investigators found ashes in buckets, kitchen pots, the fireplace, and the toilets. The unburned evidence included an ID and social security card for someone named Michael Carter, a print-off of search results listing websites for finding personal information, a book called "How to Find Anyone or Anything: It's A Lot Easier Than You Think," and a legal pad with social security numbers and other personal identifying information ("PII") belonging to celebrities. They also found a Forbes articled called "How to Ruin a Spouse's Credit Legally and Keep Them Broke for Dear Life," a laminator, a partly burned document with part of a social security number, three computers, two cheap burner phones, and a shredder containing an envelope for Amanda Montgomery.[4] Police never located a bathrobe. Investigators also searched Jackson's mother's house, where they found Jackson's business cards. He branded himself as "The Father of Identity Theft" and an "Identity Theft Expert."

Officers ran forensic analysis on the computers from Jackson's bedroom, which revealed searches on Legacy.com (a source for obituaries), Intelius, BeenVerified, PeopleFinder, Credit Karma, Ancestry.com, 411.com, and LinkedIn. Many victims starred in Jackson's search history, including Charles Fulks, the Almeidas, Thomas

---

[4] Jackson also had at the house a yellow corvette, a black Mercedes, and a white Mercedes SUV resembling the one that dropped Ford off at the hotel.

Fitzgibbon, the Howes, Peggye McNair, and many others. Although the computer username logged for all these searches was "Michelle," Jackson regularly used both computers.

Along with the evidence above, the government showed at trial that many calls involved in the identity theft scheme were made using numbers ending in -1609—the number Jackson used to pose as Fulks in his calls to the post office—or -1935. The government traced most of these calls to a cell tower directly behind Jackson's home on Cameron Ridge Trail, and Jackson's girlfriend Michelle Jones identified him as the caller in several of the fraudulent calls when she testified against him at trial.

Jackson was convicted of seven counts of mail fraud under 18 U.S.C. § 1341; one count of aiding and abetting the use of unauthorized access devices under 18 U.S.C. §§ 2, 1029(a)(2); one count of possession of fifteen or more unauthorized access devices under 18 U.S.C. § 1029(a)(3); one count of mail theft under 18 U.S.C. § 1708; and three counts of aggravated identity theft under 18 U.S.C. § 1028A(a)(1).[5]

At sentencing, the district court applied several enhancements: fourteen levels because the intended loss exceeded $550,000, §2B1.1(b)(1)(H), two levels because there were more than ten victims involved, §2B1.1(b)(2)(A)(i), two levels because the scheme involved sophisticated means, §2b1.1(b)(10)(C), two levels because the scheme involved a conscious or reckless risk of death or serious bodily injury, §2B1.1(b)(16)(A), two levels because Jackson was an organizer, leader, manager, or

---

[5] Jackson's co-defendant Derrick Ford pled guilty to using unauthorized access devices.

supervisor in criminal activity, §3B1.1(c), and two levels because Jackson willfully obstructed or impeded the administration of justice related to the investigation of his offense, §3C1.1. The district court sentenced Jackson to a within-guidelines sentence of 135 months plus 24 consecutive months for each count of aggravated identity theft, for a total of 207 months. 18 U.S.C. § 1028A(a)(1).

Jackson now appeals his convictions and sentence, arguing that the evidence was insufficient to convict and his sentence was procedurally and substantively unreasonable.

## DISCUSSION

### I. Sufficiency of the Evidence

We review a sufficiency-of-the-evidence challenge de novo and affirm if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Fisher*, 648 F.3d at 450 (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We do not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Id.* (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)). "Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt." *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004) (quotation marks and citation removed). We view the evidence not "in a vacuum" but "in relation to the other evidence in the case." *Davis v. Lafler*, 658 F.3d 525, 533 (6th Cir. 2011).

*A. Mail Fraud and Mail Theft*

Jackson first argues that no reasonable jury could have found him guilty of mail fraud and mail theft. Mail fraud requires 1) "a scheme or artifice to defraud"; 2) "use of mails in furtherance of the scheme"; 3) "intent to deprive the victim of money or property"; and 4) material misrepresentation. *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007); 18 U.S.C. § 1341. The elements of mail theft are that "(1) the defendant possessed material stolen from the mail; (2) knowing same to be stolen; (3) with intent to possess the material unlawfully." *United States v. Comer*, 93 F.3d 1271, 1276 (6th Cir. 1996) (quotation marks and citation removed); 18 U.S.C. § 1708.

Jackson does not dispute that the activity the government alleges meets these elements; he only argues that the government has not proven that he did what it alleges. So we focus on the ways he argues that the evidence is insufficient to tie him to the criminal acts. We find that the evidence presented at trial was enough for a rational jury to find him guilty on these counts.

Jackson begins by arguing that officers never found any relevant mail, the distinctive robe that the mail thief wore, or the cell phones at issue in the Cameron Ridge Trail house. This argument lacks force because of the obvious reply that Jackson anticipates: the ashes in the house likely contained much of the physical evidence. The fragments of evidence that remained support this inference; the shredder in the house had an envelope to Amanda Montgomery—who formerly lived in the now-vacant Cameron Ridge house—and utility bills tying Jackson to the house filled with smoldering papers. Near the fireplace, officers also found burnt paper

fragments with part of a Social Security number and the issuing state. In Jackson's bedroom, officers found a Tennessee ID card and Social Security card in Michael Carter's name as well as a Georgia Motor Vehicle Department receipt and registration in Phillip Landis Burnett's name. A rational jury could conclude that the reason the police did not find more evidence of identity theft in the house was that Jackson burned it. And a rational jury could infer from Jackson's destruction of evidence that Jackson was conscious of his guilt. *See Cyars v. Hofbauer*, 383 F.3d 485, 492 (6th Cir. 2004) (holding that a reasonable jury could infer guilt from a collection of evidence that included "discard[ing] the murder weapon and drugs in a manner sufficient to prevent authorities from recovering the evidence"); *United States v. Poulsen*, 655 F.3d 492, 508 (6th Cir. 2011) ("Our courts admit 'spoliation evidence, including evidence that a defendant attempted to bribe . . . a witness,' because such spoliation evidence shows 'consciousness of guilt.'") (alteration in original) (quoting *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986).

Jackson's suggestion that he was not the person who stole the last piece of mail and burnt all the evidence is equally unpersuasive. An officer testified that a black male walked from Jackson's Cameron Ridge house to the vacant house's mailbox, took the mail, and walked back. He identified the person as Jackson. And no other adult male was at the house that night. Jackson refused to answer the door as police knocked "very loudly" right after the mail theft. And he instructed Jones not to open the front door, even as the house filled with smoke. Afterward, he persuaded Jones to marry him, hoping that she would not have to testify against him if they were wed.

The jury could infer that Jackson stole the mail and then tried to destroy evidence of his guilt by burning incriminating materials.

Jackson also argues that the government never tied him to any of the addresses where the stolen mail went. That's not true. The transaction confirmation for the sale of the Howes' stocks—although it was gone by the time the officer's searched—went to the same vacant Cameron Ridge address from which Jackson stole the last piece of mail. The government also showed that some victims had mail sent to both the Waterdance address and to the Cameron Ridge address. A witness also testified that some of the victims' mail went first to a Turco Drive address before switching to Waterdance. All three houses were vacant. A reasonable jury could infer that Jackson had used these addresses as drop locations for mail fraud and theft, and those addresses cover all but one of Jackson's mail fraud victims.

The jury heard other evidence from which it could conclude that Jackson was the perpetrator of the mail fraud, including recorded phone calls made to the victims' financial institutions. After hearing the tapes played in open court, Jones identified the caller in both fraudulent Almeida calls as Jackson. She also identified him as the voice on several other fraudulent calls. The government also showed that Jackson's computer had logged many searches of the victims and their personal information, including searches for Eugenie Almeida's birthday and information about Michael Almeida. Although the username logged for these searches was "Michelle," the jury could conclude that the username did not reflect the person who ran the searches because it is not a verified record of who was using the computer at the time.

Jackson argues that the government never tied him to the phone number that called the Cordova Post Office about Fulks's stolen mail. But the government presented evidence that many of the fraudulent calls, including those to the post office, came from an area that included Jackson's home. And when the government played a recording of the Cordova Post Office call, Jones identified the caller as Jackson. Taken together, the evidence at trial was enough to allow a rational jury to conclude that Jackson did the acts that the government alleged.

*B. Aiding and Abetting Fraud in Connection with Access Devices*

The jury also convicted Jackson of aiding and abetting access device fraud which covers anyone who "knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period." 18 U.S.C. § 1029(a)(2). Access devices include cards, account numbers, or other means of account access, and an "unauthorized" access device is "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud." 18 U.S.C. § 1029(e)(1), (e)(3). "As at common law, a person is liable under [18 U.S.C.] § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014).

This conviction stands if there is sufficient evidence for a rational jury to conclude that Jackson helped obtain and use credit cards with Derrick Ford. A police officer testified that he had photos of Derrick Ford using different victims' credit

cards—including Michael Almeida's—at Kroger. And as we detail above, the jury could reasonably conclude that Jackson was part of the mail fraud that involved getting a replacement debit card tied to the Almeidas' account. Jackson and Ford stole $56,909.43 from the Almeidas. This fraud alone suffices to support the jury's verdict on this count.

*C. Possession of At Least Fifteen Unauthorized Access Devices*

The jury convicted Jackson of violating 18 U.S.C. § 1029(a)(3) by "knowingly and with intent to defraud," possessing at least fifteen "counterfeit or unauthorized access devices." Jackson does not contest that social security numbers are access devices. *See United States v. Wright*, 862 F.3d 1265, 1275 (11th Cir. 2017); *United States v. Gilmore*, 431 F. App'x 428, 429 (6th Cir. 2011) (counting social security numbers among access devices). Instead, he argues that the government did not prove either his fraudulent intent or that he possessed the access devices at the same time.

On the intent to defraud, the jury was free to conclude that Jackson had fraudulent intent based on "circumstantial evidence and by inferences drawn from examining the scheme itself." *United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007). Whether Jackson had the intent to defraud "is generally considered to be one of fact to be resolved by the trier of the facts and the determination thereof should not be lightly overturned." *Id.* (ellipses, quotation marks, and citation removed). The jury heard that officers recovered a yellow notepad filled with names and social security numbers in Jackson's kitchen. They also found that Jackson was involved in identity theft with other people's social security numbers and personal information.

The jury could reasonably conclude that Jackson possessed the social security numbers for fraudulent purposes. Jackson argues that his business card identifying him as an identity theft expert provided a better explanation for his possession of the social security numbers. Although this may seem like a plausible explanation to Jackson, it did not appear so to the jury. And the evidence taken in the light most favorable to the government supports their conclusion.

Jackson's other argument that he did not possess all the access devises at once has no merit. The statute does not require that all fifteen access devices be obtained at the same time. Jackson only had to possess all fifteen at one time, which he did—all on the same notepad.

### D. Aggravated Identity Theft

Aggravated identity theft includes committing a predicate felony, which "during and in relation to" the defendant "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." 18 U.S.C. § 1028A(a)(1). There are four elements: "(1) the defendant committed a specified predicate felony; (2) the defendant knowingly transferred, possessed, or used a means of identification of another person without lawful authority; (3) the defendant knew that the means of identification belonged to another person; and (4) the transfer, possession, or use was during and in relation to the predicate felony." *United States v. Gandy*, 926 F.3d 248, 258 (6th Cir. 2019). Mail fraud is a predicate felony. 18 U.S.C. § 1028A(c)(5); 18 U.S.C. § 1341. The jury convicted Jackson of aggravated identity theft of the Almeida's bank account and social security number; Peggye McNair's

name, date of birth, mother's maiden name, middle name, and name of bank for bill pay; and Robert Howe's name, social security number, and brokerage account number.

For the Almeidas, Jackson argues that the only evidence was that Ford used the debit card and that Jackson's computer logged a search for Mrs. Almeida's birthday. He admits that Jones identified the fraudulent Almeida caller as Jackson, but he urges that the jury should not have believed her because she was biased. But Jones' credibility was a question for the jury, not for us to second-guess on appeal. "[A]ttacks on witness credibility are simply challenges to the *quality* of the government's evidence and not to the sufficiency of the evidence." *United States v. Carter*, 355 F.3d 920, 925 (6th Cir. 2004) (emphasis in original) (quotation marks and citation removed). For this reason and the reasons we have already discussed, this argument lacks merit.

For Peggye McNair, Jackson argues that the evidence was insufficient because no evidence linked Jackson to the vacant Cameron Ridge address, the computer searches for McNair's personal information, or the phone number used for fraudulent calls in McNair's name. Each of these arguments is meritless. An officer testified that he saw Jackson steal mail from the vacant Cameron Ridge address. Jackson had access to the computer that made the searches, and Jones testified that he used the computers in his bedroom home office. And the phone number that made the fraudulent calls also had ties to the cell tower immediately adjacent Jackson's home.

Jackson's claim that no evidence supports this conviction ignores much of the trial record.

Finally, for Robert Howe, Jackson repeats that the mail addressed to the vacant Cameron Ridge address is irrelevant because Jackson has no ties to that address, and he again argues that no mail addressed to any victims was found in Jackson's (ash-filled) home. He also repeats that the computer searches and the phone calls coming from the area immediately around his house were not persuasive evidence. We need not repeat the responses to these arguments. The record does not, as Jackson asserts, show a case "devoid of evidence" of Jackson's guilt. (Appellant's Br. at 44.) Instead, it shows evidence that a reasonable jury could weigh in determining that Jackson committed the crimes charged beyond a reasonable doubt. Disagreement with how the jury weighed the evidence is different from having a record devoid of evidence.

In sum, the evidence taken in the light most favorable to the government would allow a jury to convict Jackson on all counts. We affirm the convictions.

## II. Sentence Enhancements

While Jackson presents his next claims as challenging both the procedural and substantive reasonableness of his sentence, his arguments go only to whether the district court correctly applied sentencing enhancements. Misinterpretation of a guideline would yield a procedurally unreasonable sentence. *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021). We "accept the findings of fact of the district court unless they are clearly erroneous" and generally "give due deference to

the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e); *United States v. Abdalla*, 972 F.3d 838, 850 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 1250 (2021).

## A. Loss Amount Enhancement

Jackson claims that the district court unreasonably calculated the loss amount and wrongly applied the fourteen-level enhancement for loss over $550,000. On appeal, Jackson details his arguments against the enhancement in a table, where he points out amounts that he does not believe should have been included. We review the court's determination of the amount of loss for clear error, but we review the method of calculating the loss and interpretation of the guidelines de novo. *Riccardi*, 989 F.3d at 481.

If we add together the amounts that Jackson does not dispute, he should still receive the fourteen-level enhancement. Of the twenty-six entries, Jackson marked eleven as having no issue. Those add up to $882,036.98—well above the $550,000 threshold.[6] U.S.S.G. § 2B1.1(b)(1)(H). By Jackson's own estimate, the district court was not unreasonable in applying the fourteen-level enhancement.

## B. Number-of-Victims Enhancement

The district court applied a two-level enhancement because Jackson's crime involved ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i). Jackson argues that the government did not prove that there were at least ten victims because anyone who

---

[6] This includes the higher of the actual or intended loss listed on any line to which Jackson did not object, the lower of the two numbers if Jackson objected to the higher number, and no amounts from the lines that Jackson object to altogether.

was quickly reimbursed is not a "victim." "Whether a person is a victim under the Sentencing Guidelines is a legal conclusion that appellate courts review de novo." *United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012) (cleaned up).

Victims include both those suffering "actual loss"—including "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies"—and "any individual whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1(b)(2)(A)(i), cmt. n.1, n.4(E). Jackson only argues that some victims the district court factored in did not lose money. He does not dispute that the individuals the district court named were victims of the second kind, those whose means of identification Jackson used unlawfully: the Almeidas, Ballinger, Best, Dulin, Fulks, Fitzgibbon, Hill, the Howes, Hughes, Jackson, King, Lambert, McNair, Olschwanger, the Rudolphs, and Silva. Jackson victimized more than ten people.

## C. Sophisticated Means Enhancement

The district court applied a two-level enhancement because Jackson's scheme "involved sophisticated means." U.S.S.G. 2B1.1(b)(10). The commentary adds that "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense" invokes this enhancement, including "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.* at cmt. n.9(B). This is a factual finding that we review for clear error. *United States v. Igboba*, 964 F.3d 501, 510 (6th Cir. 2020). Jackson argues that his scheme was not sophisticated because he only used the internet and

a telephone. We do not look at the elements of a scheme "in isolation"; we account for the strategy as a whole. *United States v. Tandon*, 111 F.3d 482, 491 (6th Cir. 1997).

Jackson's scheme was sophisticated. "[T]he repeated use of fictitious identities can justify a sophisticated means enhancement, particularly when the identity is reinforced through other deceptive practices . . . ." *United States v. Crosgrove*, 637 F.3d 646, 667 (6th Cir. 2011). Jackson used multiple mailing addresses—none of which were his own—to avoid detection. *See Igboba*, 964 F.3d at 512. Jackson used multiple websites to collect data on recently deceased victims so that he could contact the banks soon after the victims' deaths. He also used multiple phone numbers to conceal his identity, and he impersonated his victims over the phone. The district court did not clearly err in finding that Jackson's scheme was sophisticated.

*D. Leadership Enhancement*

The district court applied a two-level enhancement for being a "organizer, leader, manager, or supervisor" of criminal activity. U.S.S.G. § 3B1.1(c). We review this determination deferentially. *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013). Jackson argues that this enhancement was inappropriate because no evidence tied him to Ford's fraudulent acts.

Jackson again misstates the record. But because this argument is the same as his objection to the conviction for aiding and abetting fraud, we need not rehash the evidence we discussed above in Section I.B. The district court did not err in applying this enhancement.

*E. Risk of Injury Enhancement*

The district court applied a two-level enhancement for involving "the conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(16)(A). "Because the question of what constitutes endangerment is a mixed question of law and fact that is highly fact-based, we give significant deference to the district court." *United States v. Stafford*, 721 F.3d 380, 401 (6th Cir. 2013) (cleaned up). Jackson argues that the enhancement was improper because he did not perceive the risk he was creating and because no serious bodily injury resulted from his action.

Jackson's argument that he did not realize a risk to the people inside the smoke-filled house rings hollow. Assuming that awareness of risk is necessary for recklessness, there is still enough evidence to conclude that Jackson knew he was creating a risk to Jones and the children. Jones testified that she told Jackson that she and the children needed to exit the smoke-filled house, and he responded by telling them to stay inside. And the district court noted that Jackson himself needed oxygen after exiting the house. His own experience of oxygen deprivation would have triggered an awareness that his actions were dangerous, even if he were astonishingly unaware of that fact when he began burning the papers. The district court did not err in applying this enhancement.

*F. Obstruction of Justice Enhancement*

Finally, the district court applied a two-step enhancement for obstruction of justice. U.S.S.G. § 3C1.1. For this enhancement, we review the district court's factual determinations for clear error, its "determination that certain conduct constitutes

obstruction of justice" de novo, and "the application of the obstruction enhancement" de novo. *United States v. Baggett*, 342 F.3d 536, 540–41 (6th Cir. 2003). Jackson argues that this enhancement is improper because the government did not present enough evidence that the documents Jackson burnt were material evidence. We already addressed this argument in Section I.A. The jury could reasonably conclude that Jackson was burning evidence from the circumstances and from the fragments of evidence that remained, despite Jackson's best efforts.

## CONCLUSION

For these reasons, we **AFFIRM** the district court.