RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0247p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

  *Plaintiff-Appellant*,

 *v.*

WILLIAM KOZERSKI,

  *Defendant-Appellee*.

No. 19-3949

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:19-cr-00166-1—Dan A. Polster, District Judge.

Argued: July 29, 2020

Decided and Filed: August 6, 2020

Before: SUTTON, COOK, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** James A. Ewing, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellant. Christian J. Grostic, Cleveland, Ohio, for Appellee. **ON BRIEF:** James A. Ewing, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellant. Christian J. Grostic, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. William Kozerski pleaded guilty to wire fraud after he obtained six government construction contracts by impersonating a disabled veteran. His Sentencing Guidelines range depends on how to calculate the "loss" for this crime. The district

court treated the loss as the aggregate difference between Kozerski's bids and the next-lowest bids, about $250,000. The government argues the loss amount should be the total value of the contracts without deducting the value of the services provided, about $12 million. We agree with the district court and affirm.

I.

William Kozerski owned two construction companies in Detroit. He formed the second one, CA Services, to bid on Veterans Administration contracts set aside for small businesses owned by service-disabled veterans. Kozerski does not have a service-related disability, however. He convinced J.R., a service-disabled veteran, to pretend to be the company's owner. In return, J.R. would receive a cut of each successful contract.

Everything went according to plan for the first contract. Kozerski's bid won. CA Services performed the work and received payment. And J.R. received $3,750.

Over the next few years, CA Services handled five more contracts. Kozerski continued to use J.R.'s identity by forging his signature and by sending the government emails supposedly from him. As to these contracts, however, Kozerski did not pay J.R. anything, lying to him that the company did not receive any contracts after the first one.

The government eventually discovered the scheme and charged Kozerski with one count of wire fraud, 18 U.S.C. § 1343. Kozerski pleaded guilty. The plea agreement left the parties free to argue about the correct loss amount, provided it fell between $150,000 and $11.9 million.

The pre-sentence report recommended a loss amount in the $9.5 million to $25 million bracket. It reached that number by adding up the amount the government paid CA Services on all six contracts without crediting the value of the work it performed on the contracts: $11,891,243.45. This loss increased Kozerski's offense level by 20. On that view, the government says, his guidelines range should be 37 to 46 months.

Kozerski objected. He thought the loss should be the amount of profit a qualifying veteran-owned business would receive from the contract. He approximated that profit by adding

up the difference between his bid and the next-lowest bid to reach a total of $248,206. That approach, Kozerski says, yields a guidelines range of 8 to 14 months.

The district court adopted Kozerski's formula and sentenced him to a year and a day. The government appealed.

## II.

When a crime involves stolen money or property, the sentencing guidelines increase the offense level depending on the "loss" from the crime. U.S.S.G. § 2B1.1(b)(1). A loss of more than $6,500 triggers a two-level increase, a loss of more than $15,000 triggers a four-level increase, and so on. *Id.* That's the easy part.

What amounts to "loss" can be harder. While the guidelines are not a paragon of clarity on this point, they support the district court's approach. Two general principles apply to loss calculations. One is that loss generally refers to the pecuniary harm to the victim. *Id.* cmt. n.3(A)(i)–(iv). In its ordinary use and in the commentary, loss refers to economic harm. *Id.*; *see, e.g.*, Oxford English Dictionary Online (3d ed. 2020) ("Diminution of one's possessions or advantages"). That suggests the court should look to the economic harm (the pecuniary harm) that the government (the victim) suffered, a measurement that normally would pull the value of the services provided into the equation. The other principle is that loss generally turns on adding up the crime's face value and subtracting any value returned to the victim. U.S.S.G. § 2B1.1 cmt. n.3(A), (E). That's also consistent with what the court did when it accounted for the services Kozerski supplied.

The commentary, all seventeen pages, also contains an example that supports this approach. It describes how to calculate loss in the context of a procurement contract obtained by fraud, just like this one was. In doing so, it says that the court should account for the costs incurred by the defendant. *Id.* cmt. n.3(A)(v)(II). All in all, the ordinary loss-calculation rules apply, meaning Kozerski should receive credit for the work his company performed on the construction contracts.

Trying to fend off this conclusion, the government seeks refuge in the "government benefit rule." It says:

> In a case involving government benefits (*e.g.*, grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

U.S.S.G. § 2B1.1 cmt. n.3(F)(ii).

No doubt, in the context of a set-aside program, one could think of a procurement contract as a government benefit in a sense. But the rule does not apply here. The three examples offered in the commentary suggest a mismatch to begin with. For the purposes of this commentary, government benefits include "grants, loans, [and] entitlement program payments." *Id.* A set-aside construction contract does not fit naturally on that list. In particular, the other examples do not encompass conventional government procurements, in which the government pays money to obtain something it will use in return. The government does not typically issue grants or make loans because it wants a concrete deliverable in return, while it typically enters construction contracts because it wants something built. Placing government construction contracts, even those with the social-benefit overlay of a set-aside program, within the government benefit rule would expand it beyond the scope of the types of benefits covered by the examples.

Recall that another commentary provision refers to procurement fraud specifically. *Id.* cmt. n.3(A)(v)(II). It notes "fraud affecting a defense contract award" as an example of procurement fraud. *Id.* And it directs the courts to include a few specific line items ("the reasonably foreseeable administrative costs" of "repeating or correcting the procurement action affected," along with "any increased costs to procure the product or service involved") in the general loss calculation. *Id.* This commentary applies more directly to Kozerski's fraud than the government benefit rule.

Other parts of the commentary, moreover, convey appreciation of the general principle (offset the face value of the crime with the amount returned to the victim) and of ways to vary

from the principle (create specific exceptions). When it comes to Ponzi schemes, for example, the commentary says that "loss shall not be reduced by" the gains returned to early investors. *Id.* cmt. n.3(F)(iv). Another provision says that "loss shall include the amount paid for" certain misrepresented goods or services, "with no credit provided for the value of those items or services." *Id.* cmt. n.3(F)(v). The government benefit rule conspicuously contains no such language, suggesting that the customary economic rules still apply there. *See United States v. Bikundi*, 926 F.3d 761, 798 (D.C. Cir. 2019). Indeed, in its example for food stamp fraud, the government benefit rule says that for a recipient who is entitled to $100 in food stamps and defrauds the government in order to obtain $150 in food stamps, the loss calculation would be $50. Customary economics rules thus normally cover loss calculations and do so even when the government benefit rule applies.

Even if we think it is particularly offensive to commit fraud in the context of a set-aside program, as we in fact do, that does not alter this conclusion. The guidelines already convey an appreciation of when to vary from normal economic loss rules and when not to for reasons of this sort. Some crimes covered by this precise guideline receive an enhancement regardless of the economic harm they cause. Crimes involving damage to property in a national cemetery or veterans' memorial, for example, receive a two-level bump regardless of loss. U.S.S.G. § 2B1.1(b)(5). So does theft from the person of another. *Id.* § 2B1.1(b)(3). The Sentencing Commission knew how to ignore economic harm when it wished. The Commission simply did not make that choice here.

None of this of course limits a district court in accounting for the nature of the crime when it exercises its discretion in issuing a sentence. But that reality goes to the court's authority to vary up or down from the guidelines range, not to the meaning of the guidelines.

Several circuits support our approach. The Fifth and Ninth Circuits both have concluded that the government benefit rule does not apply to set-aside procurement-contract fraud cases. *United States v. Martin*, 796 F.3d 1101, 1109–10 (9th Cir. 2015); *United States v. Harris*, 821 F.3d 589, 603–04 (5th Cir. 2016). The Third Circuit takes a similar, though not identical, approach. It says that the government benefit rule would not make a difference even if it applied. *United States v. Nagle*, 803 F.3d 167, 180 (3d Cir. 2015). That's because the customary

offset rules nonetheless would apply to the benefit, leaving the government back where it started. *Id.*; *see also id.* at 183–84 (Hardiman, J., concurring in part and concurring in the judgment) (preferring to resolve the case on the ground that the government benefit rule does not apply).

The government pushes back that some grants and loans listed in the government benefit rule involve the return of value to the government. Loans must be repaid, and grant-funded activities must be performed. And all three examples seek to advance a social goal through a financial award to a specific kind of person, not unlike a set-aside contract program. Fair points all. But not one of them bridges the gap between set-aside construction contracts, in which the government needs a new building and tries to do some good along the way, and the other three examples, which are all activities the government mainly, if not exclusively, undertakes to provide benefits to certain recipients.

The government adds that 15 U.S.C. § 632(w)(1) establishes a "presumption of loss to the United States based on the total amount expended on the [fraudulently obtained] contract." But Congress enacted this provision after Kozerski committed this crime. Pub. L. No. 111-240, 124 Stat. 2504, 2543 (Sept. 27, 2010). That's too late. The statute would not apply to Kozerski anyway. It applies only when "a business concern other than a small business concern willfully sought and received the award by misrepresentation." *Id.* No one claims CA Services was "a business concern other than a small business concern," so the statute does not apply. Even on its own terms, moreover, the statute merely creates a presumption. It does not override the offset rule, which creates the possibility, indeed likelihood, that a defendant would receive credit against the contract's value if the defendant performs the contract.

While three circuits appear to take a different view, none of them comes to grips with the offset rule. The Eleventh Circuit says government set-aside contracts count as "government benefits programs" because they are "affirmative action program[s] aimed at giving exclusive opportunities to certain" kinds of businesses, "thus making them entitlement program payments." *United States v. Maxwell*, 579 F.3d 1282, 1306 (11th Cir. 2009) (quotation omitted). But at no point does it acknowledge the effect of the offset rule on this analysis or the background principle against which it operates. Indeed, as the Third Circuit concluded, the *Maxwell* case would have ended up in the same place anyway once a court applies the offset rule. *Nagle*, 803

F.3d at 180.  The other two circuits considered earlier versions of the guidelines, which did not contain the offset rule and which did not have the enumerated (and limited) examples of the government benefit rule.  *United States v. Bros. Const. Co. of Ohio*, 219 F.3d 300, 317–18 (4th Cir. 2000); *United States v. Leahy*, 464 F.3d 773, 789–90 (7th Cir. 2006).

At argument, the government raised another reason not to offset the contract price by the value of Kozerski's performance:  Veterans Administration hospitals received the benefit of Kozerski's work, not the Service-Disabled Veteran-Owned Small Business Program that administers this set-aside program and not a properly qualified construction company run by service-disabled veterans.  Because the offset rule requires a deduction for services received only for the value returned "to the victim," U.S.S.G. § 2B1.1 cmt. n.3(E)(i), and because neither this Small Business Program nor a properly qualified bidder for the project received any value, there is nothing to offset.  But this argument merely confirms the reality that set-aside programs involve more than one victim, sometimes more than one federal agency.  That does not mean the district court should ignore the effect of the offset rule on the entity that received the services.

The government places one more arrow in its bow.  It invokes the following commentary:

> Certain Other Unlawful Misrepresentation Schemes.—In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

U.S.S.G. § 2B1.1 cmt. n.3(F)(v).  As the government sees it, Kozerski's crime fits within the third category because he obtained regulatory approval—status as a Service-Disabled Veteran-Owned Small Business—through fraud.

But that position overlooks other language.  The commentary distinguishes between "services" in the list's first category and "goods" in its second and third categories.  *See Martin*, 796 F.3d at 1110.  In conventional language, one does not think of constructing buildings as a category of "goods," as opposed to "services."  And the "services" provision applies only to individuals "falsely posing as licensed professionals."  That's not what Kozerski did.  While one

circuit concluded that this commentary applied to a set-aside contract fraud, *United States v. Giovenco*, 773 F.3d 866, 870–71 (7th Cir. 2014), it never accounted for the goods/services dichotomy.

The government separately complains that, even if the offset rule governs this calculation, the district court settled on an arbitrary loss figure. In making the calculation, the district court used the aggregate difference between Kozerski's bid and the next-lowest bid on each contract to determine the loss. That figure, the court concluded, represented the best estimate from the evidence of the profits lost by the service-disabled veterans the program was intended to benefit.

We see no clear error. *See United States v. Sands*, 948 F.3d 709, 712 (6th Cir. 2020). Keep in mind that the parties, through the plea agreement, agreed that the loss would be a minimum of $150,000. In identifying a figure above that amount, the district court acknowledged the figure was an estimate of lost profits: "[I]t could have been more; it could have been less." R. 23 at 8. But the guidelines require no more than this kind of "reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). The court discussed the issue at length with the parties before ultimately issuing a written order further explaining its reasoning. That carefully considered estimate was not arbitrary.

We affirm.