NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0095n.06

Nos. 23-5217/5222

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 04, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| v. | ) ) | |
| RICKY LANIER; KATRINA LANIER, | ) ) | |
| Defendants-Appellants. | ) ) ) ) | OPINION |

Before: MOORE, STRANCH, and LARSEN Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** After a two-week jury trial, Ricky Lanier and Katrina Lanier were convicted of conspiracy to commit wire fraud, wire fraud, and major fraud against the United States. In these consolidated appeals, the Laniers argue that the district court erred in denying their motion to dismiss the indictment, that the district court erred in denying their proposed jury instructions, and that their convictions are not supported by sufficient evidence. The Laniers further challenge their sentences, arguing that their sentences are both procedurally and substantively unreasonable. We disagree. For the following reasons, we **AFFIRM** the Laniers' convictions and sentences.

## I. BACKGROUND

This case centers around two businesses—JMR Investments and Kylee Construction, and two government programs—the Department of Veterans Affairs' Service-Disabled Veteran-Owned Small Business (SDVOSB) program and the Small Business Administration's (SBA) 8(a)

Business Development program. The 8(a) program is a government set-aside program intended to benefit small businesses owned by socially and economically disadvantaged individuals. R. 648 (Trial Tr. at 116) (Klein Direct) (Page ID #12528). The SDVOSB program is a government set-aside program intended to benefit small businesses owned by service-disabled veterans. *Id.* at 34-35 (Ward Direct) (Page ID #12446–47).

JMR Investments ("JMR") is owned by Gary Richardson, a friend of Defendant Ricky Lanier ("Mr. Lanier"). R. 634 (Ricky Lanier PSR ¶ 39) (Page ID #11663). Over the course of years, JMR entered into several government construction contracts via the 8(a) program. *Id.* ¶ 50 (Page ID #11668–69). Kylee Construction ("Kylee") is owned by Emanuel Hill, a friend of Mr. Lanier's and relative of Katrina Lanier's ("Mrs. Lanier"), R. 643 (Trial Tr. at 101–02) (E. Hill Direct) (Page ID #12046–47), and, like JMR, Kylee entered into several government construction contracts via both the 8(a) program as well as the SDVOSB program, R. 634 (Ricky Lanier PSR ¶ 50) (Page ID #11669–70).

Though he did not own the businesses, Mr. Lanier ran both JMR Investments and Kylee Construction. R. 647 (Trial Tr. at 91–92) (Speight Direct) (Page ID #12406–07). "He handled the day-to-day activities of the jobs, bidding on the jobs, talking with . . . subcontractors, talking to the contracting officers, [making] site visits," and so on. *Id.* Mr. Lanier also made the decisions for the companies, determining which government programs to apply for, determining which government contracts to pursue, and deciding whether to hire subcontractors and, if so, whom to hire. *Id.* Mr. Lanier likewise was responsible for communicating with the government, other contractors, and subcontractors, *id.*, and regularly signed government documents on behalf of the companies and their owners, *id.* at 22 (Speight Direct) (Page ID #12337). Mrs. Lanier was

responsible for several financial aspects of the two businesses, including communicating with accounting and directing transfers, deposits, and withdrawals from company bank accounts. *See, e.g.*, R. 650 (Trial Tr. at 39, 44–45) (Klier Direct) (Page ID #12750, 12755–56). Mrs. Lanier also served as a notary public for both companies. *See, e.g.*, R. 643 (Trial Tr. at 50) (Speight Cross) (Page ID #11995). The Laniers together applied for the 8(a) and SDVOSB programs on JMR's and Kylee's behalf. R. 647 (Trial Tr. at 20–21) (Speight Direct) (Page ID #12335–36). Although both Gary Richardson and Emanuel Hill were eligible program participants, the Laniers were not. The owners of JMR and Kylee—Gary Richardson and Emanuel Hill, respectively—had significantly less, if any, involvement in the running of the businesses. *Id.* at 58 (Speight Direct) (Page ID #12373); R. 643 (Trial Tr. at 230) (E. Hill Cross) (Page ID #12175).

The Laniers bid on, and won, several 8(a) and SDVOSB contracts through JMR and Kylee. R. 634 (Ricky Lanier PSR ¶ 50) (Page ID #11668–70). "In total, the face value of the contracts entered into by JMR Investments and Kylee Construction is $14,825,510." *Id.* ¶ 51 (Page ID #11670).

This benefitted both the businesses and the Laniers personally. *See* R. 637 (Trial Tr. at 42–47) (Stevens Direct) (Page ID #11787–92) (analyzing $1.8 million worth of "payments to the Laniers" from JMR and Kylee that were "beyond just a paycheck"). From these JMR and Kylee contracts, the Laniers (1) transferred money to their own businesses of which they were bona fide owners, *id.* at 44–45 (Stevens Direct) (Page ID #11789–90); (2) purchased personal property, *id.* at 45 (Stevens Direct) (Page ID #11790); (3) paid for airplane travel, aviation insurance, and expenses, *id.* at 46 (Stevens Direct) (Page ID #11791); and (4) paid for social groups and activities, *id.* at 47 (Stevens Direct) (Page ID #11792).

In 2012, following a tip "that Ricky Lanier was running Kylee Construction, and not the disabled veteran," the Department of Veterans Affairs began investigating Kylee Construction. R. 650 (Trial Tr. at 13) (Klier Direct) (Page ID #12724). From that and subsequent investigations, several misrepresentations by the Laniers to federal agencies came to light. These misrepresentations included: (1) formal documents falsely stating that Emanuel Hill "bid[] and project managed all aspects of Kylee Construction jobs [and] managed materials and subcontractors on site," R. 729-1 (Program App. at 6) (Page ID #14599); R. 647 (Trial Tr. at 28) (Speight Direct) (Page ID #12343); (2) formal documents falsely stating that Emanuel Hill was a full-time employee of Kylee, R. 643 (Trial Tr. at 146) (E. Hill Direct) (Page ID #12091); (3) formal documents falsely stating that Gary Richardson was a full-time employee of JMR Investments, R. 728-3 (Vernon Richardson Dep. Tr. at 11) (Page ID #14508); (4) falsified references and statements about previous construction jobs, R. 647 (Trial Tr. at 49–51) (Speight Direct) (Page ID #12364–66); and (5) manipulated payrolls with fabricated information, R. 649 (Trial Tr. at 57–58) (Woods Direct) (Page ID #12693–94). The investigations also brought several circular financial transactions to light, *see, e.g.*, R. 657 (Trial Tr. at 182–84) (Stevens Direct) (Page ID #13104–06), and indicated that Mr. Lanier regularly signed Emanuel Hill's and Gary Richardson's names on formal documents, *see, e.g.*, R. 647 (Trial Tr. at 22–23, 59) (Speight Direct) (Page ID #12337–38, 12374). Mrs. Lanier regularly notarized documents with these fraudulent signatures. *See, e.g.*, *id.* at 32–33 (Speight Direct) (Page ID #12347–48).

The Laniers were charged with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, several counts of wire fraud in violation of 18 U.S.C. § 1343, and several counts of major fraud against the United States in violation of 18 U.S.C. § 1031. R. 151 (Second Superseding

Indictment) (Page ID #1456).  On July 29, 2022, following a two-week jury trial, the Laniers were each convicted of one count of wire fraud, one count of conspiring to commit wire fraud, and one count (Katrina Lanier) or two counts (Ricky Lanier) of major fraud against the United States of America.[1]  R. 620 (Jury Verdict) (Page ID #10233).  On December 16, 2022, prior to sentencing, the Laniers filed a motion to dismiss.  R. 672 (Mot. to Dismiss) (Page ID #13271).  On February 27, 2023, the district court denied that motion to dismiss, R. 685 (D. Ct. Order) (Page ID #13365), and on March 3, 2023, Mr. Lanier was sentenced to 48 months in prison, R. 694 (Ricky Lanier Judgment at 3) (Page ID #13734); Mrs. Lanier was sentenced to 24 months in prison, R. 696 (Katrina Lanier Judgment at 2) (Page ID #13745).  This appeal followed.

## II.  ANALYSIS

### A.  Motion to Dismiss

In their motion to dismiss, the Laniers argued that the district court abused its discretion in denying their motion to dismiss for lack of subject-matter jurisdiction or, in the alternative, on due-process grounds.  Though the Laniers do not appeal the district court's denial of the motion on jurisdictional grounds, "federal courts have a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue *sua sponte*."  *Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 465 (6th Cir. 2009).  As the district court correctly found, "[b]ecause the Laniers were convicted of violating federal criminal law," the district court had "jurisdiction pursuant to . . . 18 U.S.C. § 3231."  R. 685 (D. Ct. Op. at 1) (Page ID #13365).

---

[1]The remaining counts as to both Ricky and Katrina Lanier were dismissed upon motion of the United States.  *See* R. 694 (Ricky Lanier Judgment at 1) (Page ID #13731); R. 696 (Katrina Lanier Judgment at 1) (Page ID #13744).

Because the district court had jurisdiction to hear the case and entered a final decision, we thus have subject-matter jurisdiction to hear the appeal. 28 U.S.C. § 1291.

In their motion to dismiss, the Laniers argued next that, because the SBA failed to follow its own administrative process for investigating and terminating program eligibility, their due-process rights were violated. R. 672 (Mot. to Dismiss at 23) (Page ID #13293); 13 C.F.R. § 124.303(a); *id.* § 128.310. Specifically, the Laniers argued that, because the SBA never notified them that they were ineligible for the programs in question, nor gave them "'the specific facts and reasons' for the findings," their right to fair notice was violated and their convictions were invalid. R. 672 (Mot. to Dismiss at 25) (Page ID #13295) (quoting 13 C.F.R. § 124.304(b)). The Laniers now raise this due-process argument on appeal.

In reviewing a motion to dismiss an indictment, we review the district court's legal conclusions de novo. *United States v. Rankin*, 929 F.3d 399, 404 (6th Cir. 2019). Procedural due process requires notice and an opportunity to be heard. *Valentine v. Konteh*, 395 F.3d 626, 631–32 (6th Cir. 2005). The Laniers' due-process rights were not violated here. Criminal defendants' right to fair notice is satisfied when the indictment against them "contains the elements of the charged offense," *id.* at 631, includes facts set forth "with reasonable particularity of time, place, and circumstances," *id.* at n.1 (quoting *United States v. Cruikshank*, 92 U.S. 542, 558 (1875)), and protects the defendant from double jeopardy, *id.* at 631. Here, the indictment against the Laniers included the approximate dates on which the Laniers submitted false statements, the specific false statements they purportedly made, and how and when they submitted allegedly fraudulent documents to the government. R. 151 (Indictment at 8–14) (Page ID #1463–69). The indictment also spelled out the elements of each of the three kinds of charged offenses. *Id.* at 14–18 (Page ID

#1469–73) (conspiracy); *id.* at 18–25 (Page ID #1473–80) (wire fraud); *id.* at 27–28 (Page ID #1482–83) (major fraud). The Laniers, moreover, had a sufficient opportunity to be heard over the course of several years of district court hearings and a two-week jury trial.

The Laniers correctly note that an administrative agency, like the SBA, must "abide by the regulations it promulgates," because "[a]n agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004) (quotation marks omitted) (quoting *Sameena, Inc. v. United States Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998)). Contrary to the Laniers' argument, however, the SBA did not violate its own regulations here. SBA regulations establish procedures by which the agency can terminate or suspend participants from program participation if the participant is ineligible or if they submitted false information. 13 C.F.R. § 124.303(a)(1)-(2); *see also id.* § 128.310 (providing avenues for decertification). The criminal charges and convictions at issue in this case, however, are for wire fraud, conspiracy to commit wire fraud, and major fraud against the United States. As this court and the district court have repeatedly noted, these convictions are not for violation of a regulation nor are they directly about SBA eligibility. *See, e.g.*, R. 721 (COA Order July 10, 2023 at 5) (Page ID #14204) ("The Laniers were convicted of misrepresenting basic matters of fact whose falsity is wholly independent of program eligibility."); R. 704 (Charge Conf. Tr. at 16) (Page ID #13787). As the government correctly argues, "the jury's verdict finding the Laniers guilty of fraud was not an administrative determination of ineligibility and did not purport to terminate or decertify their businesses." Appellee Br. at 23. The criminal prosecution of the Laniers for numerous counts of fraud, accordingly, did not violate the agency's regulations

7

governing internal procedures for eligibility determinations, and thus did not violate the Laniers' due-process rights.

## B. Jury Instructions

The Laniers argue that the district court erred both by denying their proposed jury instructions and by failing to instruct the jury on the meaning of "control." "We 'review jury instructions as a whole in order to determine whether they adequately inform the jury of the relevant considerations and provide a sound basis in law to aid the jury in reaching its decision.'" *United States v. Frei*, 995 F.3d 561, 565 (6th Cir. 2021) (quoting *United States v. Fisher*, 648 F.3d 442, 447 (6th Cir. 2011)). We may reverse a judgment on the basis of improper jury instructions "only if the instructions, viewed as a whole, were confusing, misleading, and prejudicial." *Id.* (quoting *Fisher*, 648 F.3d at 447). "A district court's refusal to deliver a requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991).

We first consider the Laniers' argument that the district court erred by failing to instruct the jury on the meaning of "control." The Laniers argue that, "[w]ithout instructions on what the term 'control' means for SBA and SDVO[SB] purposes, the jury [could not] understand what sort of misrepresentations about 'control' would be material." Ricky Lanier Br. at 37. The Laniers reason that, because (1) the meaning of "control" is central to whether something is "materially false," and (2) the wire fraud charge requires the government to prove "that the Defendant said something <u>materially</u> false," therefore (3) failure to define "control" rendered the jury instructions

both confusing and prejudicial to the Laniers. *Id.* at 37–38 (quoting *United States v. Daniel*, 329 F.3d 480, 486 (6th Cir. 2003)).

As stated above, we reverse a judgment on the basis of improper jury instructions only if the instructions are, "viewed as a whole, . . . confusing, misleading, and prejudicial." *Frei*, 995 F.3d at 565 (quoting *Fisher*, 648 F.3d at 447). This is a "high standard for reversal." *Id.* (quoting *Fisher*, 648 F.3d at 447). If "the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion," we will not reverse the judgment. *United States v. Wells*, 211 F.3d 988, 1002 (6th Cir. 2000).

The district court's jury instructions, "viewed as a whole, [are] not confusing, misleading, or prejudicial." *Frei*, 995 F.3d at 565. When instructing the jury on the elements of wire fraud and major fraud against the United States, the district court instructed the jury that the scheme must have "included a material misrepresentation or concealment of material fact." R. 723 (Jury Charge at 27) (Page ID #14236). The court continued that "[a] misrepresentation or concealment . . . is 'material' if it has a natural tendency to influence or is capable of influencing the decision of a person of ordinary prudence and comprehension." *Id.* at 28, 33 (Page ID #14237, 14242). The district court accurately instructed the jury on the legal meaning of "material." *See United States v. Gaudin*, 515 U.S. 506, 509 (1995); *United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*, 34 F.4th 507, 516 (6th Cir. 2022). The materiality requirement, moreover, "presents 'a fairly low bar for the government to meet.'" *United States v. Wellman*, 26 F.4th 339, 350 (6th Cir. 2022) (quoting *United States v. White*, 270 F.3d 356, 365 (6th Cir. 2001)). The jury was thus properly instructed to consider how the Laniers' statements did influence, or were capable of influencing, the decisions of others. Though statements implicating control are one type of

9

statement that may "influence a government decisionmaker," here, the SBA, they are not the only type of statement that may be material. *Wolf Creek*, 34 F.4th at 516 (quoting *United States ex rel. Am. Sys. Consulting, Inc. v. ManTech Advanced Sys. Int'l*, 600 F. App'x 969, 973 (6th Cir. 2015)). To understand the elements of the charged offenses, the jury needed to understand the meaning of "material." The district court properly instructed the jury on the meaning of "material," giving the jury a "sound basis in law with which to reach a conclusion." *Wells*, 211 F.3d at 1002.

The Laniers additionally argue that the district court erred by failing to utilize their proposed jury instruction. The Laniers' proposed jury instruction was not a correct statement of the law. The Laniers' proposed jury instruction stated, in relevant part, that:

> For example as to Count 1, if you find that Ricky Lanier and / or Katrina Lanier conspired with one or more persons to defraud the Government by violation of SBA regulations regarding affiliation and control, and requirements for admission to the 8(a) Program found in 13 CFR § 124.106 and SDVSOB Program found in 13 CFR § 125.13, then the required element of intent has been met by the government . . . .

> For example as to Counts 3, 18, 19, 20, if you find that the Government has proven beyond a reasonable doubt that Ricky Lanier and / or Katrina Lanier acted to intentionally defraud the government by violation of SBA regulations regarding affiliation and control, and those requirements for admission into the 8(a) Program found in 13 CFR § 124.106 and SDVSOB Program found in 13 CFR § 125.13, then the required element of intent has been met by the government . . . .

R. 600 (Defs. Proposed Jury Instructions at 13) (Page ID #9469).

The district court considered the Laniers' proposed instruction, but noted that "it makes it sound as if [the Laniers are] being charged with violating the regulation. And that's just not the charge." R. 704 (Charge Conf. Tr. at 16) (Page ID #13787). The district court continued that the proposed instruction "lowers the standard" for conviction and "makes it easier to be convicted," because it requires only that the defendants violate the regulation, but an individual "can violate a regulation without defrauding." *Id.* at 18–19 (Page ID #13789–90). Because there is "a lot more

to criminal fraud than just violating a regulation," the district court denied the Laniers' proposed instruction. *Id.* at 20 (Page ID #13791). We may reverse based on a district court's refusal to deliver a proposed instruction only if, among other things, the proposed instruction is a correct statement of the law. *Williams*, 952 F.2d at 1512. Violation of a regulation is not an element of the crimes for which the Laniers were charged. Because the proposed jury instruction includes a requirement that the defendants "defraud the government by violation of SBA regulations," the instruction is not a correct statement of the law. R. 600 (Def. Proposed Jury Instructions at 13) (Page ID #9469). The district court did not err in refusing this instruction.

## C. Sufficiency of the Evidence

"We review sufficiency of the evidence challenges de novo to determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Mathis*, 738 F.3d 719, 735 (6th Cir. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Because sufficiency of the evidence is a legal question, we "neither 'independently weigh[] the evidence, nor judge[] the credibility of witnesses who testified at trial'"; we do not "substitute [our] judgment for that of the jury." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (quoting *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999)).

The Laniers argue that the government failed to provide sufficient evidence to convict them for (1) wire fraud under 18 U.S.C. § 1343 and (2) major fraud against the United States under 18 U.S.C. § 1031. To convict a defendant of wire fraud under 18 U.S.C. § 1343, "the government must prove '(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property.'" *United States*

11

*v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (quoting *United States v. Prince*, 214 F.3d 740, 747–48 (6th Cir. 2000)). To convict a defendant of major fraud against the United States under 18 U.S.C. § 1031, the defendant must "knowingly execute[], or attempt[] to execute, any scheme or artifice with the intent[] (1) to defraud the United States; or (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises, in any . . . [government] contract" with a value of $1 million or more. 18 U.S.C. § 1031(a). As to both counts, the Laniers specifically—and exclusively—challenge the sufficiency of the evidence on the element of intent.

The Laniers assert that the government failed to offer any proof at trial that either of them had a specific intent to defraud the government. Ricky Lanier Br. at 39–42; Katrina Lanier Br. at 40–43. "[B]ecause it is difficult to prove intent to defraud from direct evidence, a jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom." *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (quoting *United States v. Cooper*, No. 02-40069–01/02/03–SAC, 2004 WL 432236, at *4 (D. Kan. Feb. 10, 2004)). Circumstantial evidence, in turn, may alone be sufficient to sustain a conviction. *See, e.g.*, *United States v. Washington*, 715 F.3d 975, 980–81 (6th Cir. 2013). In *United States v. Davis*, for example, we held "that a reasonable juror would have sufficient basis to find [the defendant] guilty" and to find that the defendant had the intent to defraud based on the evidence that he concealed activity, wrote checks for the fraudulent activity, and was present during the fraudulent activity, in combination with the fact of excessive profits. 490 F.3d at 549–50.

Contrary to the Laniers' assertion, the government offered significant circumstantial evidence demonstrating their specific intent to defraud the government. The government presented evidence that Mr. Lanier (1) signed false signatures, R. 647 (Trial Tr. at 22) (Speight Direct) (Page

12

ID #12337); (2) lied on government forms about individuals' responsibilities and hours, R. 643 (Trial Tr. at 146) (E. Hill Direct) (Page ID #12091); (3) falsely stated that a subcontractor's employee was an employee of JMR, R. 649 (Trial Tr. at 57–58) (Woods Direct) (Page ID #12693–94); and (4) directed others, specifically Katrina Lanier and Joe Hill, to transfer money for the purpose of concealment, *see, e.g.*, R. 657 (Trial Tr. at 193) (Stevens Direct) (Page ID #13115). The government also presented evidence that Mrs. Lanier (1) notarized falsified signatures, *see, e.g.*, R. 647 (Trial Tr. at 32–33) (Speight Direct) (Page ID #12347–48); (2) ordered a transfer of $100,000 into and out of Kylee Construction's bank account for the purpose of concealment, R. 657 (Trial Tr. at 182–84) (Stevens Direct) (Page ID #13104–06); (3) facilitated a transfer of $37,000 to Joe Hill and then promptly facilitated a transfer of $37,000 from Joe Hill to Kylee Construction, among other circular transactions, R. 650 (Trial Tr. at 39–40) (Klier Direct) (Page ID #12750–51); and (4) falsely characterized deposits as gifts from family, *id.* The government also presented evidence that the Laniers received tremendous profit from their involvement with JMR and Kylee Construction. *See* R. 637 (Trial Tr. at 42–47) (Stevens Direct) (Page ID #11787–92) (discussing the Laniers' personal financial enrichment). As in *Davis*, a reasonable jury could consider this circumstantial evidence and draw reasonable inferences to support a guilty verdict. This evidence of concealment activity, false statements, fabricated signatures and notarizations, and profit, together forms sufficient evidence to demonstrate intent. Viewed in the light most favorable to the prosecution, the government thus provided sufficient evidence to support the verdicts of wire fraud and major fraud.

**D. Sentencing**

With the Laniers' convictions affirmed, we turn to their sentences. Both Mr. and Mrs. Lanier argue that their sentences are procedurally and substantively unreasonable.

**1. 16-Level Increase for Amount of Loss**

When a district court calculates "the Guidelines range for a defendant convicted of fraud, the sentence is enhanced 'in proportion to the amount of actual or intended pecuniary loss that resulted from his offense.'" *United States v. Johnson*, 79 F.4th 684, 706 (6th Cir. 2023) (quoting *United States v. Igboba*, 964 F.3d 501, 508 (6th Cir. 2020)). The Sentencing Guidelines spell out how many levels to increase the offense level based on the specific dollar amount of loss: "A loss of more than $6,500 triggers a two-level increase, a loss of more than $15,000 triggers a four-level increase, and so on." *United States v. Kozerski*, 969 F.3d 310, 312 (6th Cir. 2020); U.S.S.G. § 2B1.1(b)(1). If the loss is "[m]ore than $1,500,000" but does not exceed $3,500,000, a sixteen-level increase applies. U.S.S.G. § 2B1.1(b)(1)(I).

The Laniers argue that the district court erred in calculating the amount of loss in this case. Specifically, the Laniers argue that the district court's finding of more than $1.5 million in loss— and resulting sixteen-level increase in their Guidelines ranges—was erroneous. Whereas the district court found that the loss amount was at least $1.5 million, but not more than $3.5 million, R. 716 (Sent'g Hr'g Tr. at 55) (Page ID #14115), the Laniers argue that, because "[t]he Government received the services and work that it desired when entering the contracts," the "credit to [the Laniers] in accordance with the Sentencing Guidelines should be the full amount of the contracts," thus resulting in a "loss amount equal [to] $0." Ricky Lanier Br. at 48.

We review the district court's calculation of the amount of loss for clear error and review its methodology de novo. *Washington*, 715 F.3d at 984. "In challenging the court's loss calculation, [a defendant] must carry the heavy burden of persuading this Court that the evaluation of the loss was not only inaccurate, but outside the realm of permissible calculations." *United States v. Gray*, 521 F.3d 514, 543 (6th Cir. 2008) (alteration in original) (quoting *United States v. Hamilton*, 263 F.3d 645, 654 (6th Cir. 2001)).

When doing loss calculations, a district court must "make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). "[L]oss generally refers to the pecuniary harm to the victim." *Kozerski*, 969 F.3d at 313. Fraud involving "set-aside programs," like those at issue here, may "involve more than one victim," including the government, which was directly defrauded, and the qualified section 8(a) participants and "service-disabled veterans the program was intended to benefit." *Id.* at 315–16. "[If] there is a loss but it reasonably cannot be determined," the district "court shall use the gain that resulted from the offense as an alternative measure of loss." U.S.S.G. § 2B1.1 cmt. n.3(B). A loss calculation, moreover, must "account for the costs incurred by the defendant." *Kozerski*, 969 F.3d at 313. Stated otherwise, a defendant must get credit for "services rendered[] by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i). In effect, that means that the value of services rendered by the defendant must be subtracted from the loss calculation. *See Kozerski*, 969 F.3d at 313 ("[L]oss generally turns on adding up the crime's face value and subtracting any value returned to the victim.").

In *Kozerski*, like here, a defendant fraudulently obtained government construction contracts through a Department of Veterans Affairs program. *Id.* at 312. To calculate the amount of loss,

the *Kozerski* district court estimated "the amount of profit a qualifying veteran-owned business would receive from the contract," but for the defendant's fraud. *Id.* By estimating only the profits a qualifying business would have received—rather than the full contract amount—the loss calculation properly accounted for the value returned to the government. Because this calculation, which estimated only profit, "account[ed] for the costs incurred by the defendant," we affirmed. *Id.* at 313.

The district court in this case, like the *Kozerski* court, determined loss amount by estimating the profit a qualifying business would have received from the contract. In *Kozerski*, the district court determined the difference between Kozerski's bid and the next lowest bid to approximate the profit another business would have received from the contract. The district court here approximated profit by looking directly at the profit the Laniers made from the fraudulent contracts.[2] Though the approaches differ, both courts' calculations approximated the same thing: "profits lost by the service-disabled veterans [and socially and economically disadvantaged persons] the program[s were] intended to benefit." *Id.* at 316. By looking at profit rather than full contract price, the district court here properly credited the Laniers with the value of the services they rendered to the government and "account[ed] for the costs incurred by the defendant." *Id.* at

---

[2]The district court determined the Laniers' approximate profit margins based on record evidence. R. 716 (Sent'g Hr'g Tr. at 17) (Page ID #14077); *see* R. 649 (Trial Tr. at 14–15) (Woods Direct) (Page ID #12650–51) (indicating that the Laniers paid the subcontractor $511,814.60 for a particular project); R. 648 (Trial Tr. at 154–58) (Klein Direct) (Page ID #12566–70) (indicating that the Laniers received $1,103,634.55 from the government for that particular project). *See also* R. 634 (Ricky Lanier PSR ¶ 51) (Page ID #11670) ("In total, the face value of the contracts entered into by JMR Investments and Kylee Construction is $14,825,510. The defendants sub-contracted each project, and those subcontractors were paid for each completed project. So, JMR Investments and Kylee Construction's profit (conservatively calculated at 15% of the value of each contract) totals $2,835,576.30.").

313. By looking at profit rather than full contract price, the district court properly calculated "loss amount . . . as the contract price, less the value of the services received by the contracting agency." Appellant Reply Br. at 3. The Laniers fail to show that the district court's loss calculation was "outside the realm of permissible calculations." *Gray*, 521 F.3d at 543 (quoting *Hamilton*, 263 F.3d at 654).

### 2. Sophisticated-Means Enhancement

Mrs. Lanier claims that the district court improperly applied a two-level enhancement for the use of "sophisticated means" under section 2B1.1(b)(10)(C) of the Sentencing Guidelines. We review the determination of whether conduct constitutes "sophisticated means" for clear error. *Igboba*, 964 F.3d at 510. The Sentencing Guidelines provide for a two-level enhancement of a defendant's offense level if their offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). "[E]specially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," such as the "hiding [of] assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts," ordinarily qualifies as "sophisticated means" and invokes this enhancement. *Id.* at cmt. n.9(B).

Mrs. Lanier correctly argues that the "sophisticated means" enhancement depends on "the actions taken by the individual," and "a defendant who takes part in a complex conspiracy should 'not automatically [be] given a sophisticated means enhancement if his or her own personal involvement did not constitute sophisticated means.'" Katrina Lanier Br. at 51–52 (quoting *United States v. Kraig*, 99 F.3d 1361, 1371 (6th Cir. 1996)). Mrs. Lanier is incorrect, however, to claim that her individual conduct did not rise to the level of sophisticated means.

We have previously held that the "funneling of transactions through relatives in order to disguise the origin of funds is sufficient to support an enhancement for sophisticated means." *United States v. Simmerman*, 850 F.3d 829, 833 (6th Cir. 2017) (quoting *United States v. Erwin*, 426 F. App'x 425, 437 (6th Cir. 2011)). Mrs. Lanier (1) ordered a circular transfer—a transfer of $100,000 in and then nearly immediately out of a Kylee Construction bank account, R. 657 (Trial Tr. at 182–84) (Stevens Direct) (Page ID #13104–06); (2) facilitated the transfer of $37,000 to Joe Hill via check, to then immediately turn around and facilitate the transfer of $37,000 from Joe Hill back to her, for use by Kylee Construction, R. 650 (Trial Tr. at 39–40) (Klier Direct) (Page ID #12750–51); and (3) falsely stated that multiple deposits, at least one of $37,000 and another of $174,000, were gifts from Joe Hill, *id.* Moreover, "the repeated use of fictitious identities can justify a sophisticated means enhancement, particularly when the identity is reinforced through other deceptive practices." *United States v. Crosgrove*, 637 F.3d 646, 667 (6th Cir. 2011). Mrs. Lanier (4) set up a fake business mailing address by paying Joe Hill to receive mail for Kylee Construction at his home address, R. 728-2 (Joe Hill Dep. at 11–14) (Page ID #14470–73); and (5) notarized several documents with forged signatures on them, *see, e.g.*, R. 647 (Trial Tr. at 32–33) (Speight Direct) (Page ID #12347–48). Taking all of this evidence together, the district court did not clearly err in applying the sophisticated-means enhancement to Mrs. Lanier's offense level.

### 3. Departure for Mr. Lanier's Health

Mr. Lanier argues that the district court erred in declining to depart downwards on account of his poor health under U.S.S.G. § 5H1.4. Ricky Lanier Br. at 49–50. The government argues that Mr. Lanier waived this argument when he informed the district court that he was seeking only a variance and not a departure. *See* Appellee Br. at 51. Mr. Lanier, however, filed a sentencing

memorandum requesting a "[d]ownward [d]eparture for [p]oor [p]hysical [h]ealth." R. 651 (Ricky Lanier Sent'g Mem. at 1) (Page ID #12890). We, moreover, have previously considered a defendant's request for departures and variances despite the defendant's "confusing language" conflating these two concepts. *See United States v. Madden*, 515 F.3d 601, 609–10 (6th Cir. 2008). We thus address this argument.

The district court "noted . . . Mr. Lanier's health issues[, and] considered those." R. 716 (Sent'g Hr'g Tr. at 94) (Page ID #14154). Despite that consideration, the district court found that there was nothing "at all that takes . . . Mr. Lanier['s health issues] out of the heartland of cases or defendants that the Court deals with." *Id.* "Before a departure is authorized" in this circuit, "the circumstances of the case must be sufficiently unusual and 'outside the heartland of cases' to warrant such a departure." *United States v. Tocco*, 200 F.3d 401, 432 (6th Cir. 2000) (quoting *United States v. Crouse*, 145 F.3d 786. 788–89 (6th Cir. 1998)). A district court's decision not to depart downward is generally not subject to our review, "unless the record reflects that the district court was not aware of or did not understand its discretion to make such a departure." *United States v. Theunick*, 651 F.3d 578, 592 (6th Cir. 2011) (quoting *United States v. Puckett*, 422 F.3d 340, 345 (6th Cir. 2005)). Here, the district court (1) considered Mr. Lanier's health issues, R. 716 (Sent'g Hr'g Tr. at 94) (Page ID #14154), and (2) directly solicited argument about bases for departures during the sentence hearing, indicating that the court understood that it had discretion to make such a departure, *id.* at 58 (Page ID #14118). Mr. Lanier fails to make any argument to the contrary. We, accordingly, decline to review the district court's decision not to apply a downward departure to Mr. Lanier's sentence on account of his health.

**4. Substantive Reasonableness**

Because the district court's sentencing decision was procedurally sound, we now "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). "Substantive reasonableness focuses on whether a 'sentence is too long (if a defendant appeals) or too short (if the government appeals)' and whether 'the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual.'" *United States v. Morris*, 71 F.4th 475, 483–84 (6th Cir. 2023) (quoting *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018)). "Sentences within a defendant's Guidelines range are presumptively substantively reasonable, a presumption that naturally extends to sentences below the Guidelines range." *United States v. Pirosko*, 787 F.3d 358, 374 (6th Cir. 2015).

The Laniers argue that their sentences are substantively unreasonable because the district court "rejected all of [their] arguments and suggestions as to how the sentence should be calculated . . . and reject[ed] the proposal for an alternative sentence." Ricky Lanier's Br. at 42; Katrina Lanier's Br. at 43–44. The Laniers further argue that "the Court was unreasonable in its rejection of the abundant proof about [the Laniers'] tight-knit family, as well as [their] contributions to [their] family and community." Ricky Lanier's Br. at 51; Katrina Lanier's Br. at 55. Contrary to the Laniers' argument, however, the district court specifically addressed each of these factors, noting that the Laniers had "no criminal record," had "good ties to the community, good family support," and "were respected members of the community." R. 716 (Sent'g Hr'g Tr. at 94–97) (Page ID #14154–57). The Laniers present no evidence that these factors were weighed improperly. Moreover, both the Laniers' sentences fall below their Guidelines range: Mr. Lanier

20

had a Guidelines range of 70 to 87 months in prison, *id.* at 58 (Page ID #14118), but was sentenced to 48 months in prison, *id.* at 98 (Page ID #14158).  Likewise, Mrs. Lanier had a Guidelines range of 57 to 71 months in prison, *id.* at 59 (Page ID #14119), but was sentenced to 24 months in prison, *id.* at 102 (Page ID #14162).  These below-Guidelines sentences are presumptively substantively reasonable, *Pirosko*, 787 F.3d at 374, and the Laniers have failed to rebut that presumption.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the Laniers' convictions and sentences.